IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| Kayla Devlin<br>　　　　Plaintiff,<br><br>　　　vs.<br><br>Gwynedd Mercy University,<br><br>　　　　Defendant. | Civil Action No. _____<br>JURY TRIAL DEMANDED |

## COMPLAINT

1. Plaintiff Kayla Devlin ("Kayla") brings this civil action under Federal law seeking compensatory damages and injunctive relief against defendants for offenses arising from, *inter alia*, Defendant's (a) Violations of Section 504 of the Rehabilitation Act of 1973 and 1974; (b) Negligent Infliction of Emotional Distress; and (c) Intentional Infliction of Emotional Distress.

### JURISDICTION AND VENUE

2. This Court has subject matter jurisdiction over Section 504 of the Rehabilitation Act of 1973 and 1974 (herein "Section 504") claims in this case pursuant to 28 U.S.C. § 1331, as those claims arise under the laws of the United States. *See* 29 U.S. Code § 794.

3. This Court has supplemental jurisdiction over the Pennsylvania law claims in this case pursuant to 28 U.S.C. § 1367 because those claims are so related to the claims that are within this Court's original jurisdiction that they form part of the same case or controversy.

4. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims set forth herein occurred within the jurisdiction of this Court.

## PARTIES

5. Plaintiff Kayla Devlin resides in Richboro, Pennsylvania. As was known to Defendants at all times relevant to this action, Kayla is a qualified individual with a disability under Section 504 of the Rehabilitation Acts of 1973 and 1974. Kayla has a diagnosis of multiple sclerosis ("MS").

6. Defendant Gwynedd Mercy University ("GMU"), is a private religious university with an address of 1325 Sumneytown Pike, Gwynedd Valley, PA 19437. At all times relevant to this matter, upon information and belief, GMU received Federal Financial Assistance in the form of research grants and student loans.

## FACTS

7. Kayla is a qualified individual with a disability under Section 504 of the Rehabilitation Acts of 1973 and 1974. Kayla has a diagnosis of multiple sclerosis ("MS").

8. She was a student at the University's Bachelor of Science in Nursing Program ("the Program") for the 2015-2016 school year, and then on medical leave for the 2016-2017 school year following her diagnosis.

9. In the Spring of 2016, she began to work with the University's Student Accessibility Services Office ("SAS") so that she could return to the Nursing Program for the 2017-2018 school year with reasonable accommodations for her MS in the Program's instructional, assessment, and clinical settings.

10. The University refused her reasonable accommodations – purportedly based on a policy that disqualifies nearly all mobility-impaired individuals from becoming nurses – and the

SAS repeatedly discouraged her from pursuing a career in nursing. As set forth in detail below, the University has thus violated Section 504 of the Rehabilitation Act and caused Kayla significant harms.

A. **The University re-admitted Kayla to the BSN Program for Fall 2017 following an MS-related medical leave.**

11. Kayla matriculated in the Program in the fall of 2015. She did well in her first year of classes, earning a spot on the Dean's List.

12. During the summer of 2016, she was diagnosed with MS after seeking treatment for symptoms of weakness, fatigue, and motor dysfunction.

13. On 24 August 2016, she notified Dr. Mary Hermann, Director of the Program, that she would need to take a leave from the program for the Fall 2016 semester due to her medical issues. Dr. Hermann met with Kayla shortly thereafter, completed the necessary leave paperwork with her, and approved the leave.

14. Three months later, on 14 November 2016, Kayla informed Dr. Hermann that she would need to extend her leave through the Spring 2017 semester on her doctor's orders as she continued in care for her MS. Kayla offered to send her doctor's letter to that effect to Dr. Hermann. Dr. Hermann responded encouragingly. She let Kayla know in an email of that same day that she was "glad to read that you will be returning in the fall [of] 2017." She also noted that:

> Upon returning in the fall [of] 2017, you will need to complete an application form from the Admissions office to reapply since it will be a year, but this is mainly a formality. You will be able to continue as a nursing student. I suggest that, if possible, [you] contact me in the spring [of] 2017 to register for courses.

Dr. Hermann copied both Dr. Cheryl Horsey and the University's Registrar's office on her response.

15. Kayla's condition unfortunately took a turn for the worse from November 2016 through mid-March 2017. Then, however, things for her appeared to get back on track for her. She and her treatment team arrived at an effective treatment regimen.

16. Her MS went largely into remission, and she was left with symptoms only of intermittent fatigue and occasional motor dysfunction. These symptoms require her to occasionally use a cane. Kayla's doctor cleared her to return to the University.

17. Accordingly, Kayla reached out to Dr. Hermann a in March of 2017 to re-apply. Dr. Hermann responded encouragingly. She re-iterated on 31 March that the reapplication "is a formality." The two met on 18 April 2017 to discuss Kayla's return. Kayla fulfilled all the University's requirements for re-admission to the BSN program. Then, on 28 April 2017, Kayla contacted Dan Jordan of SAS to request accommodations for Fall 2017.

B.  **SAS Refused to Reasonably Accommodate Kayla's Disability**

18. Mr. Jordan responded that same day. He asked Kayla to review the SAS webpage and to send him her doctor's documentation, her forms, and her fall schedule. She did. They then met on 4 May 2017 to, ostensibly, discuss how to accommodate Kayla within the BSN program. The meeting instead became a session of Mr. Jordan repeatedly discouraging Kayla from pursuing her dream of becoming a nurse.

19. During their encounter, Mr. Jordan repeatedly made insinuations that Kayla cannot, because of her disability, become a nurse. He told her (among other things) that "nursing is the most stressful profession" and that she "cannot miss any clinical days, even for

infusion." He then asked her – even though he had a doctor's letter clearing her for return to a nursing program, and the University had re-admitted her – "What if you can't feel a pulse?"

20. Kayla left his office feeling as if the University did not want her as a student. She became anxious about how she would be treated on her return. And shortly thereafter, her MS symptoms, which can be exacerbated by stress, began to worsen. She experienced weakness in her hand, extreme fatigue, vision changes, back and leg pain, and numbness and tingling in her hands and legs. Kayla worked with her treatment team to manage these symptoms.

21. She also resolved to remain a BSN student at Gwynedd because Mr. Jordan's discouragement and derision were so different from the encouragement she received from Dr. Hermann.

22. On 3 August 2017, Kayla and Mr. Jordan spoke again. She requested a number of accommodations, including the occasional use of a cane during instructional and clinical time. SAS refused the accommodation in clinical settings. In a letter dated 11 August 2017, SAS took the position that allowing Kayla the cane in clinical settings was not a reasonable accommodation, but rather a "fundamental alteration" to the BSN program.

23. In support of this claim, SAS relied primarily on two University policies. The first is the Student Guidebook section on Non-Academic Criteria for Admission and Retention for all Nursing Students, which provides:

> "The nursing program has specified nonacademic criteria which all applicants/students are expected to meet in order to participate in the nursing

program. These criteria include, but are not limited to . . . . manual dexterity, gross and fine movements."

As indicated by Kayla's readmission by the Nursing Program, she was able to meet these criteria.

24. The second policy on which GMU relied was the dress code. SAS notes that item 17 of the dress code provides: "[s]tudents may not have cast/orthopedic braces/assistive devices in the clinical area."

25. SAS reads these University policies together to mean that Kayla's occasional need for a cane amounts to a balance and coordination deficit that would jeopardize patient safety. Furthermore, the way SAS reads these policies together effectively bars *any* student who relies on *any* assistive device from participating in clinical work – and, consequently, from becoming a nurse through the University's BSN program.

26. When Kayla received this denial of accommodations from the University, she was devastated. It became clear to her that the University would not accommodate her as a qualified handicapped individual. Moreover, the stress of learning that the University would bar her from pursuing her dream of being a nurse – coupled with SAS's claim that no person who uses a cane can be a safe and competent nurse – caused another flare in her MS symptoms.

27. Whereas she had been decreasing her medication dosages before 11 August, after that, her treatment team had to increase her dosage amount and frequency of use. And as she grappled with whether to continue at the University, where she now knew she was no longer seen as a full person, or matriculate elsewhere, which would likely mean losing all of her progress towards her degree, Kayla's stress continued to increase.

28. Beginning on 27 August, she experienced new symptoms including peripheral tingling, altered facial sensation, numbness of the face and tongue, and extreme pain. She was hospitalized on 1 September 2017. Upon discharge, her medication was increased again.

29. Kayla ultimately decided to withdraw from the University and matriculated in another nursing program. She was unable to transfer any of her credits. She has also been unable to resume her studies because of how the stress of how she was treated by the University exacerbated her MS symptoms. This will delay her graduation and start of her career by at least a year.

## COUNT I: VIOLATIONS OF SECTION 504 OF THE REHABILITATION ACT

30. Plaintiff hereby incorporates each and every allegation in the preceding paragraphs of this Complaint as if set forth fully herein.

31. As an educational institution that receives federal funding, the University is subject to Section 504 of the Rehabilitation Act.

32. Section 504 requires colleges and universities to provide reasonable accommodations to students in instructional and clinical settings alike. Kayla requested a reasonable accommodation in the form of the occasional use of a cane in clinical settings. The University refused, taking the position that Kayla, because she needs a cane – and, indeed, any student who requires use of *any* assistive device – cannot render safe care, and therefore cannot be a competent nurse.

33. This is a patently absurd position for the University to take. Nurses with mobility impairments requiring the use of a cane or brace work in both slow- and fast-paced clinical settings, up to and including emergency medicine and trauma surgery. There is no evidence that the need to use a cane is tantamount to an inability to meet the academic and non-academic requirements of the BSN curriculum. The SAS's claim that a

student's need to use an assistive device indicates an inability to render safe and competent care thus is offensive to all students with disabilities, including Kayla.

34. And the result that the SAS's reading of the University's policies leads to – effectively prohibiting all students with mobility impairments who require assistive devices from ever becoming nurses – is equally absurd.

35. The way the University told Kayla that she was no longer welcome as a BSN student was also shocking. The University's agent at SAS, Mr. Jordan, used his knowledge of Kayla's disabilities to embody in an official University communication his own personal doubts about whether she can be a nurse:

> There are no accommodations for which issues of balance and coordination can be effectively mitigated. As an alternative, from speaking with you, fatigue is a major contributor to symptom manifestation. Your request for breaks during clinical rotations is reasonable. Breaks for 10-15 minutes every few hours would be coordinated with the site supervisor at times when patient care and other clinical activities would not be impacted negatively. *Although reasonable, it may not be sufficient to manage the symptoms related to balance and coordination overall.* (emphasis added).

36. In other words, Mr. Jordan said to Kayla that (1) he understands her MS, (2) what the University is offering as accommodations is not enough, and (3) no accommodations can ever be enough. He took pains to convince Kayla that she should abandon her dream because of her disability. And because he did so despite Kayla's exceptional academic performance, he, speaking on behalf of the University, did so *exclusively* because of her disability.

WHEREFORE, plaintiff requests the following relief:

    a) Compensatory damages to plaintiff against defendant;

    b) Punitive damages to plaintiff against defendant; and

    c) Such other and further relief as appears reasonable and just.

## COUNT II: NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

37. Plaintiff hereby incorporates each and every allegation in the preceding paragraphs of this Complaint as if set forth fully herein.

38. The Defendant owed a duty to exercise reasonable care to Kayla as a paying student and an individual with a disability.

39. The Defendants were negligent and breached their duty to exercise reasonable care in providing a safe environment for Kayla as she studied at the University. GMU was aware of Kayla's multiple sclerosis, its symptoms, and the triggers to those symptoms. SAS had a particular duty and relationship with her, namely, to see that her disabilities were understood and reasonably accommodated. Yet, GMU administrators continued to deny Kayla access to the accommodations she required to be successful. Further, administrators did their best to push Kayla away from the nursing program by attempting to convince her that she was not physically capable of being a health professional.

40. As a result of the Defendant's conduct, Kayla suffered emotional distress that the Defendant knew or should have known would be and was the likely result of its actions and omissions. More particularly, Kayla suffered indignities, humiliation, severe emotional distress, and mental anguish. This emotional distress manifested as physical symptoms as well.

WHEREFORE, plaintiff requests the following relief:
   a) Compensatory damages to plaintiff against defendant;
   b) Punitive damages to plaintiff against defendant; and
   c) Such other and further relief as appears reasonable and just.

## COUNT IV: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

41. Plaintiff hereby incorporates each and every allegation in the preceding paragraphs of this Complaint as if set forth fully herein.

42. As set forth above, Defendant was aware of Kayla's MS. So armed with this knowledge, SAS not only refused to fulfill its duty to accommodate her, it used that knowledge to verbally attack Kayla. GMU's agent told Kayla, essentially, "you should give up because you are disabled." Such conduct is offensive to a degree that shocks the conscience.

43. As a result of the emotional abuse, Kayla's mental, emotional, and behavioral health has declined. Kayla has exhibited significant and concerning changes in behavior, and she has experienced a diminished enjoyment of life.

WHEREFORE, plaintiff requests the following relief:

a) Compensatory damages to plaintiff against defendant;

b) Punitive damages to plaintiff against defendant; and

c) Such other and further relief as appears reasonable and just.

Dated: 28 June 2018

Respectfully submitted,

*[signature]*

Michael D. Raffaele, Esq. (PA ID 91615)
Andrew Wollaston, Esq. (PA ID 322861)
1230 County Line Road
Bryn Mawr, PA 19010
T: (610) 922-4200
F: (610) 646-0888
Michael@MyKidsLawyer.com
Andrew@MyKidsLawyer.com
Counsel for Plaintiff